No. 82-226

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

_____

VIVIAN CRABTREE,

                    Plaintiff and Respondent,

        vs.

MONTANA STATE LIBRARY, an
agency of the State of Montana,
and SARA PARKER, (sub nom.),
in her capacity as Montana
State Librarian,

                    Defendants and Appellants.

_____

Appeal from:  District Court of the First Judicial District,
              In and for the County of Lewis and Clark
              Honorable Gordon Bennett, Judge presiding

Counsel of Record:

    For Appellants:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Roy H. Andes, Assistant Attorney General, argued,
        Helena, Montana

    For Respondent:

        James P. Reynolds argued, Helena, Montana

    For Amicus Curiae:

        Patricia Schaefer, Dept. of Admin., Helena, Montana
        Jan Van Riper, Dept. of Labor & Industry, Helena,
        Montana
        Mae Nan Ellingson, City Attorney's Office, Missoula,
        Montana

_____

                        Submitted:  March 1, 1983

                        Decided:  June 16, 1983

Filed:  JUN 16 1983


                    _____
                                Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

The defendants, Montana State Library, et al. (Library), appeal an order of the Lewis and Clark County District Court requiring the Library to reopen the hiring process for a position which they had already filled, and that they give an absolute preference to any minimally qualified veteran or disabled civilian over all nondisabled civilian applicants. The plaintiff, Vivian Crabtree (Crabtree), brought this action under a veterans and disabled civilians preference statute, section 10-2-203, MCA, which states:

"Preference in appointment and employment.
(1) In every public department and upon all public works of the state of Montana and of any county or city thereof, the following shall be preferred for appointment and employment: veterans, their spouses and surviving spouses, and other dependents of disabled veterans and disabled civilians recommended by the rehabilitative services division of the department of social and rehabilitative services.

"(2) Age, loss of limb, or other physical impairment which does not in fact incapacitate does not disqualify any disabled veteran or civilian provided he or she possesses the business capacity, competency, and education to discharge the duties of the position involved."

Crabtree invoked this statute, and pursuant to the remedy provided for in section 10-2-206, MCA, filed an action in District Court asserting the statutory preference for public employment. She alleged that she was a disabled person, that she qualified for the position, and that the Library denied her the statutory preference.

Although the Library challenged Crabtree's standing in trial court and did so initially in the briefs filed before this Court, at the oral argument of this appeal the Library conceded that Crabtree had standing to file the lawsuit. Having conceded the standing issue, two issues remain.

- 2 -

First, the Library contends that the trial court erred by interpreting the preference in appointment and employment statute as creating a job entitlement for any minimally qualified veteran or disabled applicant. Second, the Library claims that the remedy ordered by the trial court is too extensive. The trial court reopened the hiring process for this position by ordering that the position be redefined and readvertised. We affirm.

Crabtree has been legally blind from birth as a result of congenital cataracts. She does have some residual vision and can read printed pages with the help of a device that magnifies print. She has a Bachelor's degree in social work from the University of Montana.

In August 1981, the Library announced a position opening for a coordinator of volunteer services and circulated a Notice of Position Open throughout the state. According to the notice, the duties of the job were to design and implement a state-wide program using volunteer readers to record library materials for the blind.

In September 1981, Crabtree formally applied for the job stating on her application that she is legally blind. The Library concedes that Crabtree was qualified for a hiring preference because of her condition. The Library received a total of 46 applications, and four of these applicants claimed a disabled preference. A preliminary screening of the applications was done by scoring each applicant on a rating scale developed by the Library. Points were assigned in eight categories including voice evaluation, ability to plan and conduct workshops, ability to identify needs of handicapped, ability to work well with people, public relations, organizational skills and self-starting ability,

library skills and training, and consultative skills.  After the preliminary screening, the Library called ten applicants for a personal interview.  Crabtree had scored 50 points and was called.  The three other disabled applicants were also called.  One purpose of the interview was to obtain additional information from the applicants about their qualifications.  Based on the interview, the Library added points to an applicant's scores when appropriate.  On September 22, 1981, the State Librarian notified Crabtree that another person had been hired.  Crabtree then filed an action in District Court.

At the hearing in trial court, a witness for the Library testified that Crabtree was rejected because she lacked essential qualifications in voice evaluation, ability to plan and conduct workshops, public relations, library skills, and consultative skills.  Crabtree testified that the interviewer failed to ask her questions designed to elicit information about each of those specific areas.  As an example, Crabtree claims that she was not asked about her speech training.  The person who was eventually hired was given 17 points in the voice evaluation category because she had three college speech courses.  Crabtree also had three college speech courses, but was not asked about them and received no points for voice evaluation.

The Library argues that section 10-2-203, MCA, creates a preference for veterans or qualified disabled civilians who are within the pool of truly qualified applicants. Subsection (1) of the statute provides that a veteran or disabled civilian " . . . shall be preferred . . . "; subsection (2) contains the language " . . . provided he or she possesses the business capacity, competency, and

education to discharge the duties of the position involved." Relying on this language, the Library argues that the legislature did not intend that any minimally qualified veteran or disabled civilian would be entitled to employment. Rather, the Library argues, the statute creates a preference for veterans or qualified disabled civilians who are within the pool of truly qualified applicants.

Under this interpretation strict equality of qualifications for the position would not be required, and the preference would be invoked when applicants are approximately equal. The Library argues, therefore, that if an employer reasonably believes that some non-preferred applicant is substantially better qualified the employer would have the discretion to hire the best applicant. We disagree. We do not believe that the legislature intended the preference to be triggered only when the applicants are approximately equal. The history of the statute leads us to the conclusion that the entitlement was intended.

The trial court addressed this issue in a well reasoned memorandum opinion, which we quote and adopt with approval:

> "[t]he question must be viewed as one of first impression and its resolution be based mainly on statutory construction.
>
> "The statute was born in the wake of World War I and limited its provisions to veterans only. (Chapter 211, L. 1921.) From this earliest enactment, it was clear the preference was intended to be absolute. Age, loss of limb or other physical impairment '. . . which does not in fact incapacitate" would not be deemed disqualification for preference, provided the veterans possessed 'the business capacity, competency and education to discharge the duties of the position involved.' This language persists, unchanged, to this day (10-2-203(2)). Clearly, actual incapacitation to discharge the duties of the position was the only ground intended to deprive the veteran of preference. This cannot be construed to be a relative preference, it is an absolute preference having nothing whatever to do with the

- 5 -

qualification of other applicants. This original section was amended six years later to include disabled civilians, and the section was not otherwise altered. (Chapter 133, L. 1927.) In 1937 the section was amended to give it the teeth it now has in Section 10-2-206. (Chapter 66, L. 1937.) This [section] provided a right of action to any person entitled to preference who was denied a position and who felt that '. . . he is in fact qualified physically, mentally and possesses business capacity, competency and education to discharge the duties of the position applied for. . .'. Again, this language remains unchanged to date and is not a declaration of a <u>relative</u> preference but an absolute one, viz., if he can discharge the duty he's entitled to the job. The legislature has looked at this 'Veterans Preference Act' at least nine times since 1937 (1943, 1947, 1949, 1955, 1969, 1975, 1977, 1979 and 1981) and left these original provisions undefiled. There has not been, and there is not today, any language in the statute that suggests that the preference is relative to the qualification of any other applicant. The only limiting factor is the ability of the disabled civilian, or veteran, to do the job.

"The Montana Supreme Court, in 1941, found that the Anaconda mayor had to give the preference to a veteran if the veteran were '. . . qualified for the position within the contemplation of the statute.' It did not elaborate upon what it felt the statute contemplated in this regard, but I believe the case, taken in its entirety, would support the proposition that the mayor had to hire the veteran if he could do the job. The court decided the mayor did not abuse his discretion in determining the veteran could not handle the job. (<u>Horvath</u> <u>v.</u> <u>Mayor</u> <u>of</u> <u>Anaconda</u>, 112 M. 266). . .

"Statutory construction and such precedent we have would give Montana veterans and disabled civilians who meet the minimum qualifications for a state, county or municipal job an absolute preference over all other non-veterans or non-disabled civilians under Section 10-2-203."

We hold that an absolute preference was intended by the enactment of section 10-2-203, MCA, and therefore, that the trial court properly construed the preference in appointment and employment statute.

Before discussing the remedy ordered by the District Court, which the Library argues is too extensive, we discuss our holding in relation to the issues raised by amicus, all

of whom seek reversal of the District Court order. While it is not our custom to address separately issues not raised by the parties, we depart from that practice here because of the widespread impact that the Library and amicus argue our opinion will have on the hiring practices within state and local levels of government. The Department of Labor and Industry argues that an absolute entitlement ruling runs afoul of the Human Rights Act, specifically section 49-1-102, MCA, which prohits "discrimination because of race, creed, religion, color, sex, physical or mental handicap, age, or national origin." The main argument is that the preference statute, so construed, discriminates against females because the vast majority of the military who would be entitled to the preference, is comprised of men. The Department of Administration argues that the order runs afoul of the Governmental Code of Fair Practices, and specifically section 49-3-201(1), MCA, which provides in part that government agencies shall appoint personnel "on the basis of merit and qualifications." The Department of Administration further argues that hiring on the basis of "minimum qualifications" will cause nothing but headaches for the personnel departments of the government. Finally, the City of Missoula and the League of Cities and Towns argue also that the order runs afoul of the Human Rights Act (section 49-1-102, MCA, supra) and that the hiring of personnel based on minimum qualifications will result in the cities being flooded with claims of liability based on the emerging tort of negligent hiring.

We view the veterans and disabled civilians preference statute as being in essence an affirmative action program--a program designed to confer certain benefits on those classes

covered. The statute covers female veterans as well as male veterans; it covers all disabled civilians. As such, the statue does not single out women to discriminate against. The statute protects women as well as it protects men. Indeed, although it may be true that more men than women are veterans, it follows that more spouses of veterans are women. Spouses are also entitled to the preference, regardless of sex. Insofar as the veterans preference is concerned, in construing a Massachusetts veterans' preference act, the United States Supreme Court aptly summarized the purpose of the preference: "The law remains what it purports to be: a preference for veterans of either sex over nonveterans of either sex, not for men over women." Personnel Administrator of Mass. v. Feeney (1979), 442 U.S. 256, 280.

In _Feeney_, the Supreme Court interpreted a statute granting preferences only to members of the military. The Montana statute goes further to extend the preference to women by including spouses and dependents of veterans as well as disabled civilians. Clearly, the Montana statute is even further from running afoul of equal protection considerations.

The Department of Administration claims that the District Court's order prevents it from discharging its duties under section 2-18-102(1)(b), MCA, that of "foster[ing] and develop[ing] programs for recruitment and selection of capable persons" for state positions. The Department is also charged with implementing and maintaining the State's Equal Employment Opportunity and Affirmative Action programs. Section 49-3-201, MCA. The Department argues that the District Court's order conflicts with section 49-3-201(1), MCA, which provides that:

> "State and local government officials and supervisory personnel shall recruit, appoint, assign, train, evaluate, and promote personnel <u>on the basis of merit and qualifications</u> without regard to race, color, religion, creed, political ideas, sex, age, marital status, physical or mental handicap, or national origin." (Emphasis added.)

We do not, however, view section 49-3-201, MCA, as conflicting with the preference in appointment and employment statute. The Department acknowledges that it has a duty to implement and maintain affirmative action programs, and we view the preference statute as simply being an affirmative action program. Although the Department argues that the absolute preference conflicts with section 49-3-201, the Department does not begin to suggest that section 49-3-201 would likewise bar a relative preference such as argued for by the Library. If section 49-3-201 would not conflict with a relative preference we see no reason why it must conflict with an absolute preference. The preferences in section 10-2-203 were granted by the legislature, and they must be given full effect.

The Department of Administration also argues that the term used by the District Court in its order--"minimum qualifications" or "minimally qualified"--is a term of art used by personnel specialists and therefore that it will cause nothing but headaches for the personnel divisions of state government. Crabtree agrees that the term used by the trial court may at first glance be confusing and ambiguous, but suggests that the terms were meant to be a short-hand method of designating compliance with the statutory requirement that the applicant possess the "business capacity, competency, and education to discharge the duties of the position involved." Section 10-2-203(2), MCA. We agree. The minimum qualifications are simply those

qualifications of capacity, competency and education as defined by the agency for doing the particular job. If, therefore, a preferred applicant meets those qualifications, he has met the "minimum qualifications" for the position and must be hired.

Amicus City of Missoula and Montana league of Cities and Towns argue also that an absolute preference conflicts with the Human Rights Act because it discriminates against women who comprise an inordinately small part of the military. We have already rejected this argument in discussing the arguments of the Department of Labor and Industry. The second argument of the local governments is that an absolute preference would expose local governments to an endless barrage of lawsuits based on the emerging tort of negligent hiring. This argument is based on the unfounded assumption that the preferred applicant would not be required to be qualified for the particular job. We have held, however, that the applicant who gets the job, even though entitled to a preference, must still be qualified for the job. Section 10-2-203, MCA, clearly sets forth that requirement.

The Library next contends that the remedy ordered by the trial court is too extensive. The trial court ordered the Library to redefine and readvertise the position and to reopen the entire hiring process for this position. The Library contends that the trial court's order goes beyond the remedy provided by section 10-2-206 which authorizes a district court hearing to show cause why the person entitled to a preference should not be employed, after which the court may order the appointing authority to comply with the law in giving the preference. The Library contends that the statutory remedy is limited to the petitioner, but that the

trial court has improperly enlarged the remedy to include a class of applicants for the reopened position.

The trial court, however, was not faced with a situation where the library position had been properly advertised according to job description and the rating scale used in the selection process. Rather, the job advertisement notice gave all applicants hardly any idea of what factors would be considered in the selection process. Given this situation, it was only fair that not only Crabtree, but that all applicants be given another opportunity to apply for the position with the knowledge of what factors would be relied on in the selection process.

The trial court looked at the minimum requirements set forth in the Library's Notice of Position Open and found little correlation between the job description and the rating scale used in the selection process. For example, the notice of position open places a heavy emphasis on library skills and training. However, library skills and training are only given four points out of 100 on the evaluation sheet. None of the three finalists, including the person selected, received any points for library skills and training. On the other hand, voice evaluation skills and ability to conduct workshops were given a great deal of weight on the rating scale, but were not specifically mentioned in the Notice of Position Open. The trial court found other deficiencies with the hiring process which we need not point out here. We agree with the trial court's conclusion that the minimum qualifications for the position were never clearly determined, were not communicated by the Notice of Position Open, and therefore could not have been used as a basis for

evaluating Crabtree's application or in according her preference.

We hold that the remedy ordered by the trial court is the only way for Crabtree and other applicants to be given a meaningful opportunity to demonstrate their qualifications and for the Library to comply with the preference in appointment and employment statute.

The order of the District Court is affirmed.

_____
Justice

We concur:


_____
Chief Justice


_____


_____


_____


_____
Justices

Mr. Chief Justice Frank I. Haswell specially concurring:

I concur that the statute in question mandates an absolute preference for qualified disabled persons and with the remedy ordered by the majority.

My quarrel is that the majority opinion goes beyond the issues raised by the litigants in this case and rules on extraneous matters raised by amici for the first time on appeal. This Court has held on many occasions that it will not address issues raised for the first time on appeal, Spencer v. Robertson (1968), 151 Mont. 507, 445 P.2d 48; Clark v. Worrall (1965), 146 Mont. 374, 406 P.2d 822; State Highway Comm. v. Milanovich (1963), 142 Mont. 410, 384 P.2d 752; nor will it consider new arguments and new theories of relief raised for the first time on appeal, Akhtar v. Van de Wetering (1982), _____ Mont. _____, 642 P.2d 149, 39 St.Rep. 400.

Furthermore, this Court has consistently held that amici cannot raise issues not raised by the parties and such issues will not be addressed by this Court. State ex rel. Department of Health and Environmental Science v. La Sorte (1979), 182 Mont. 267, 596 P.2d 477; Department of SRS v. Angel & Fisher (1978), 176 Mont. 293, 577 P.2d 1223; State ex rel. Kvaalen v. Graybill (1972), 159 Mont. 190, 496 P.2d 1127; State ex rel. Bennett v. Bonner (1950), 123 Mont. 414, 214 P.2d 747.

The reasons for these rules are manifold: (1) The theories and arguments in the case should not be changed by amici at the expense of the litigants by injecting new and extraneous issues in the case. (2) The trial court had no opportunity to hear argument, consider or rule upon new

issues raised for the first time on appeal. (3) The ever-present danger that issues and arguments not considered in the trial court and not considered significant or controlling by the litigants themselves will not be adequately briefed or argued on appeal.

For these reasons, I would adhere to the salutary rule heretofore expressed and observed by this Court.


_____
Chief Justice